**Opinion issued June 27, 2023**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-23-00031-CV, NO. 01-23-00032-CV**

———————————

**IN THE INTEREST OF K.J.B., A CHILD**

**IN THE INTEREST OF A.R., A CHILD**

---

**On Appeal from the 245th District Court**
**Harris County, Texas**
**Trial Court Case Nos. 2021-00968J & 2021-00833J**

---

## MEMORANDUM OPINION

M.J.R. (Mother) appeals the trial court's orders terminating her parental rights to her two sons, K.J.B. and A.R. In her sole issue, Mother contends that the evidence is factually insufficient to support the trial court's finding that termination of her parental rights is in the best interest of the children. We affirm.

## Background

These appeals involve two brothers: K.J.B., who was born in June 2014, and A.R., who was born in January 2016.

### A.    Procedural History

On March 4, 2021, the Department of Family and Protective Services (the Department) received an "intake" alleging neglectful supervision of five-year old A.R. by Mother. Police officers found A.R. walking down a busy street towards Highway 290. The police report described A.R. as dirty, with hives on his skin, and wearing a soiled diaper. A.R., who was non-verbal, could not tell officers where he lived. When police officers eventually located Mother, she appeared to be under the influence of alcohol or drugs and later tested positive for methamphetamine.

On May 20, 2021, the Department filed its Original Petition for Protection of a Child for Conservatorship and for Termination in Suit Affecting the Parent-Child Relationship in Cause No. 2021-00833J. In its petition, the Department requested that the case be set for a hearing to determine whether A.R. should be removed from his home and placed in the Department's temporary managing conservatorship. On June 10, 2021, the Department filed its Original Petition for Protection of a Child for Conservatorship and for Termination in Suit Affecting the Parent-Child Relationship in Cause No. 2021-00968J, seeking emergency possession of K.J.B.

The affidavit of Danitra Fields-Frazier, a Department caseworker, was attached to the petitions.

In her affidavit, Fields-Frazier stated that Mother had five children but only A.R. and K.J.B. were still in her care. Her affidavit detailed Mother's history with the Department:

- In June 2009, the Department received a referral alleging physical abuse of another child, J.R., by Mother. When J.R. was born, Mother tested positive for barbiturates and opiates, and J.R. tested positive for barbiturates. J.R. was placed with a relative, and Mother went to jail.

- In November 2011, the Department received a "case" alleging physical abuse of another child, J.S.R., by Mother. The report alleged that Mother was using crack cocaine while pregnant and tested positive. J.S.R. was removed from Mother and her parental rights were terminated in Cause No. 2011-07542J. J.S.R. was later adopted.

- In July 2014, the Department received a "case" alleging physical abuse of K.J.B. by Mother. The report alleged that Mother knowingly smoked crack cocaine while in her last trimester of pregnancy with K.J.B. The allegations were investigated but there was no evidence that Mother caused a physical injury resulting in substantial harm to K.J.B.

- In August 2014, a report was made alleging neglectful supervision of K.J.B. by Mother. Police officers were called to Mother's residence because Mother and her boyfriend were fighting and Mother was holding K.J.B. during the fight. Mother tested positive for drugs after being admitted to a treatment center.

Fields-Frazier stated that Mother continued to place her children in danger due to her substance abuse history and ongoing drug use, her extensive criminal history, including drug-related offenses, and her history with the Department

3

including the termination of her parental rights to another child. The Department requested to be named temporary managing conservators of K.J.B. and A.R.

On June 10, 2021, the trial court made the requisite findings to place K.J.B. in the Department's emergency possession. Following a full adversary hearing on the same day, the trial court ordered that A.R. be placed in the Department's temporary conservatorship. Following a full adversary hearing, with respect to K.J.B., the trial court signed an order on July 2, 2021, in which it made the necessary findings to keep K.J.B. in the Department's temporary conservatorship.

On July 12, 2021, the Department filed a family service plan for Mother. The plan stated that the Department's permanency goal was reunification of the boys with Mother. It described K.J.B. as a healthy seven-year-old boy with no physical limitations, developmental delays, or emotional or behavioral health issues. K.J.B. was placed with his father and stated that he was happy but that he missed Mother.

The plan described A.R. as a healthy five-year old boy with no physical limitations. The plan stated that A.R. had "severe to profound intellectual disability and/or autism spectrum disorder with marked to profound deficits in adaptive functioning in one or more areas: communication, social participation and independent living across multiple environments." It stated that A.R.'s cognitive functioning appeared "to be at or below the moderate intellectual range resulting in severe and profound deficits in comprehension, achievement, and adaptive

4

functioning," and that he was nonverbal. A.R. had "mild problems with attachment," "may have mild problems with separation (e.g., anxious/clingy behaviors in the absence of obvious cues of danger) or may avoid contact with caregiver in age-inappropriate way, and "may have minor difficulties with appropriate physical/emotional boundaries with others." The plan noted that A.R. had "a moderate level of problems with emotional control that interferes most of the time with functioning." It stated that A.R. "was having problems with parents, siblings, and/or other family members that were negatively impacting his functioning. Frequent arguing or difficulty maintaining positive relationships may be observed." The plan noted that A.R. "demonstrates a mild level of interpersonal strengths. [A.R.] has some social skills that facilitate positive relationships with peers and adults but may not have successfully maintained previous healthy friendships. [A.R.] is experiencing severe disruptions in his social relationships. [A.R.] may have no friends or have constant conflict in relations with others or have maladaptive relationships with others. The quality of the [A.R.'s] social relationships presents imminent danger to his safety, health, and/or development." The report stated that A.R. was placed in a foster home and had "adjusted well to his placement and enjoys being around other children." The Department's goal was for Mother to "get her substance use treated and under control," obtain employment to be able to provide

5

the basic necessities for herself and her children, and be able to provide the children with structure, supervision, and a safe and stable home.

To achieve these goals, the Department's family service plan required that Mother:

(1) refrain from engaging in criminal activity,

(2) maintain employment and provide payroll stubs to her caseworker,

(3) maintain safe and stable housing for a minimum of six consecutive months,

(4) enroll A.R. in school,

(5) connect with the autism community and join an autism spectrum disorder group,

(6) educate herself on how to parent a child with special needs,

(7) submit to random urinalysis and hair follicle testing,

(8) continue attending outpatient treatment,

(9) complete a drug assessment,

(10) complete a domestic violence assessment due to past allegations of intimate partner violence,

(11) participate in individual therapy and follow all recommendations, and

(12) participate in psychosocial and psychiatric evaluations.

On July 21, 2021, the trial court held a status hearing in K.J.B.'s and A.R.'s cases and approved the Department's family service plan for Mother.

On November 29, 2022, shortly before trial, the Department filed its final permanency report with the court which provided additional details about K.J.B. and addressed Mother's compliance with her family service plan. The report stated that K.J.B. was initially placed with his father but was later removed from his father's home in November 2021 after his father "packed up all his belongings and left and stated that he was no longer going to be taking care of [K.J.B.] . . . ." and told the Department that his mother could care for K.J.B. K.J.B.'s paternal grandmother called the Department to inform them that she had been diagnosed with brain cancer and was not able to care for K.J.B., and that the Department would need to find another placement for him. K.J.B. was placed in a foster home in November 2021 and later moved to the same foster home where A.R. was placed in July 2022. The report described K.J.B. as a happy, healthy eight-year old boy who enjoyed watching YouTube, liked riding his bike and playing with his friends, and loved animals. The report noted that after a follow-up appointment with his pediatrician in July 2021, K.J.B. showed signs of a recurring eating disturbance and qualified for mental health services. The report stated that, in August 2021, a psychologist diagnosed K.J.B. with "adjustment disorder with anxiety, attention deficit/hyperactivity disorder, combined presentation, child neglect, confirmed."

Regarding Mother, the report stated that Mother had refrained from engaging in criminal activity from August 2021 through September 2022. In October 2022,

however, Mother was arrested for "prostitution w/3rd or more." The report stated that Mother sporadically provided her caseworker with proof of income. From January through May 2022, she provided proof that she was receiving government assistance and that her boyfriend received income. However, Mother failed to provide proof of income for the six months leading up to trial, from June through November 2022.

As to housing, Mother failed to provide proof of stable housing to her caseworker from September through December 2021, but she provided proof of housing in January and February of 2022. The report showed that, in April 2022, Mother requested housing through the Star of Hope program. From May through July 2022, she lived with her mother while waiting for housing through Star of Hope. In August 2022, Mother informed the Department she was seeking housing through a program called "The Palace." However, in October 2022, Mother told her caseworker that "The Palace" was no longer working with her and she was homeless. As of November 2022, the month before trial, Mother remained homeless.

The report showed that Mother initially made progress with her substance abuse treatment. In September 2021, she was working on completing her outpatient treatment at Santa Maria. In October 2021, Mother decided to admit herself into Santa Maria's thirty-day inpatient program because she was drinking and fighting with her boyfriend. From January to April 2022, Mother was participating in an

outpatient program with the Bes Group. However, in June or July 2022, Mother was unsuccessful in completing the program due to a positive drug test. Following another substance abuse assessment, the Department recommended that she complete eight individual substance abuse counseling sessions. On October 7, 2022, Mother failed to show up for her counseling session. The report stated that Mother was not in contact with her substance abuse counseling provider, and the provider was unable to reach Mother to reschedule her session.

The report showed that Mother initially complied with the mandatory random drug testing. She tested negative from August 2021 through May 2022, although she failed to show up for two tests in February and March 2022. She tested negative in March and April 2022 but tested positive for cocaine in May 2022. Following the positive test, Mother failed to show up for requested testing every month from June through November 2022.

## B. Trial

Trial began on December 7, 2022. Two witnesses testified: Molly Moser, a Department caseworker, and L.P., the boys' foster mother. Mother did not appear. K.J.B.'s father and A.R.'s father also failed to appear at trial.

Moser testified that she had been assigned to work on K.J.B.'s and A.R.'s cases for a little over a year. Moser last spoke to Mother two days before trial and told her that the final trial date was set for December 7.

Moser testified that, on November 4, 2022, Mother called her and told her that she was homeless and living in her son's car and that she may not be able to participate in visitation. Moser told Mother that if she was able to find transportation to visitation, Moser would ensure that the visit would happen.

Moser testified that the Department requested that Mother submit to drug testing on November 8, 2022, but Mother did not show up. Moser testified that a "no show" to a requested drug test is considered a positive test. Moser stated that Mother also did not appear for requested drug tests on July 7, August 10, September 8, September 12, October 6, and October 26, 2022. In June 2022, Mother submitted to a hair follicle test and tested positive for cocaine. Moser testified that at the permanency hearing on August 17, 2022, the trial court ordered Mother to submit to drug testing, but she did not show up.

Moser testified that the Department removed the boys from their home after police officers found A.R., who was then five years old, walking along the feeder road of Highway 290 and dressed in a diaper. She testified that A.R., who is special needs and was diagnosed at an early age with autism, is nonverbal and was unable to tell the officers who his mother was or where he lived. When the officers located Mother, she appeared to be under the influence of drugs or alcohol and later tested positive for methamphetamines.

Moser testified that Mother also failed to comply with the Department's family service plan. She testified that Mother's illegal drug use constituted conduct that was harmful to her children as well as a violation of her court-ordered service plan. Moser stated that, as of November 2022, Mother did not have a stable home or employment. Moser testified that Mother had been visiting the children regularly. Moser testified that Mother relinquished her parental rights to another child, J.L.R., in 2012. The court then recessed the trial to allow the parents an opportunity to be present.

On December 16, 2022, the trial resumed. Mother again failed to appear.

Moser testified that Mother had a pending criminal charge at the time of trial for "prostitution for a third or more offense." Moser testified that, in 2022, Mother posted several photos of A.R. with his shirt off on Facebook. In her posts, Mother stated that A.R.'s eczema was not being taken care of because he was having outbreaks and that he had never been as skinny in his life as he was in the photos. Mother stated in her posts that she did not believe that A.R. was being treated properly and asked others for their opinions. Moser testified that Mother received a lot of comments on her post. Mother also commented on Facebook that she has never missed visitation with the boys, and that the Department is "racist," "mean," and "unhelpful" and has done nothing to help her get her children back and is only trying to take them away from her. Moser testified that the Department was concerned that

11

Mother was inappropriately posting edited photos of her children and promoting disinformation about her open cases with the Department and the quality of care K.J.B. and A.R. were receiving in their foster home. Moser testified that she visited A.R. every month and that the photos did not reflect A.R.'s condition at all. On December 6, 2022, A.R. was seen by his pediatrician who stated that A.R., who was previously classified as overweight, was now within his normal weight range.

K.J.B. and A.R. were placed in the same foster home at the time of trial. Moser testified that A.R. had been in the foster home since February 2022 and K.J.B. was placed in the same home in July 2022. She stated that the boys' needs were being met in their foster placement, both boys were doing very well, and they were attending school. She testified that K.J.B. and A.R. were evaluated regularly by their medical providers. Moser testified that the Department was seeking termination of Mother's parental rights to K.J.B. and A.R. due to Mother's endangering conduct and her failure to comply with her court-ordered service plan.

On cross-examination, Moser testified that while Mother did not appear at trial and had some "falling off" from the service plan, she had previously been fairly active with her plan. She testified that Mother completed a substance abuse assessment in June 2022, and that she enrolled herself in an inpatient program although the recommendation had only been for outpatient services. Moser testified that Mother later re-engaged in outpatient services and had only a few more sessions

to attend to be successfully discharged, and that she successfully completed an individual therapy program. Mother provided Moser with three paycheck stubs during the pendency of the case showing that she was employed in home healthcare. Moser testified that Mother completed all but one session of her domestic violence treatment program.

Moser testified that Mother submitted to monthly drug testing from the beginning of the cases through June 2022, and that she only tested positive for drugs once during that time. Mother later admitted to using drugs and began substance abuse treatment again. Moser testified that Mother completed the special needs parenting classes and joined a support group for parents of children with autism, required under the plan. She testified that Mother was consistent with her visitation with the boys for the most part, and she brought food, drinks, and art projects to keep the boys entertained for the four-hour visits. Moser observed that Mother was loving and bonded with the children during her visits.

Moser testified that although A.R. is still primarily nonverbal, his verbal skills have improved a lot since he has been in his foster placement. He is now able to read books, answer "yes" and "no," and say his name. She testified that Mother was unhappy and worried for K.J.B.'s safety when he was placed with his father because she felt that his needs would not be met.

13

Moser testified that the foster parent has not expressed an interest in adopting A.R. She agreed that it would be challenging to find an adoptive home for A.R. but stated that the Department recently sent out a legal broadcast for A.R. and intended to send out a nationwide broadcast for both siblings so they could remain together. Moser testified that the Department had received one home study, but she did not know the status of that study. Moser also testified that she received information that a teacher at K.J.B.'s school expressed interest in adopting both boys.

Moser testified that when A.R. came into the Department's care, he was a "wild" child and ran outside any time that a door opened. She testified that, during one of her visits, A.R. darted outside and Mother could not handle his behavior. When A.R. was placed in his first foster home, he was entirely non-verbal, flung things across the room, threw tantrums, hit himself and tried to strike adults, broke things, and ate with his hands. Moser testified that after A.R. was placed in his first foster home, his behavior drastically changed and he flourished in the placement.

Moser testified that at the time K.J.B. came into the Department's care, he was being neglected educationally and was very behind in school. Moser stated that Mother was so overwhelmed trying to handle A.R. that she was unable to care for K.J.B. Moser testified that at the time of the children's removal, Mother was living with her boyfriend at his apartment. Mother and her boyfriend had a domestic violence disturbance that prompted Mother and the children to move out of her

14

boyfriend's apartment. The boyfriend later informed the Department that Mother had returned to prostitution, and he sent the Department sexually explicit photos of Mother that she had posted on a website. Moser stated that Mother was charged with prostitution for the third time. She testified that Mother's conduct posed a danger to the children because it would expose them to strangers in their home and put them at risk of sexual abuse.

Moser testified that the boys are currently in a loving foster home with parents who are preschool teachers and own a daycare. She stated that while the foster placement informed her that they are not seeking adoption they told the Department that they will keep the boys as long as necessary. She stated that when she learned of Mother's allegation that A.R. was being starved, she went to the foster home and observed that it was full of food and toys and that A.R. was acting normally. During her visit, Moser read a book with A.R., and he sang "Frozen" on a karaoke machine and played archery outside. She testified that A.R. is learning sign language as well as his colors, letters, and numbers.

The foster mother testified that A.R. came into her home in February 2022 and K.J.B. was placed with her in July 2022. When A.R. was initially placed with her, he was rambunctious and impulsive. She stated that A.R. was currently receiving occupational therapy, speech therapy, and play therapy. She stated that since A.R. has been in her home, she has noticed a big difference in his conduct. She

15

stated that he learns something new every day. She testified that A.R. is sweet and that he is still impulsive but not as much as when he was first placed with her. The foster mother saw Mother's posts of A.R. on Facebook and felt that they were not accurate. She stated that A.R. loves to eat, and that he loves bananas, rice, and beans, but that he does not like bread. She testified that K.J.B. is doing well in school and his grades are improving. She stated that although she does not plan to adopt K.J.B. and A.R., they can stay with her for as long as necessary until the Department is able to find an adoptive placement for the boys. The foster mother stated that Mother has thanked her numerous times for taking such good care of K.J.B. and A.R. and has asked her on multiple occasions if she would adopt them. The foster mother said she would not have any issue with Mother staying in communication with K.J.B. and A.R. after their cases concluded.

On December 30, 2022, the trial court signed a final decree of termination in Cause No. 2021-00968J, finding that clear and convincing evidence existed to support a finding under Texas Family Code Sections 161.001(b)(1) (D), (E), and (O), and that termination of Mother's parental rights to K.J.B. was in the best interests of the child.[1] On December 30, 2022, the trial court signed a final decree of termination in Cause No. 2021-00883J, finding that clear and convincing evidence

---

[1] The trial court also terminated K.J.B.'s father's parental rights pursuant to Section 161.001(b)(1)(N) and (O) and found that termination was in the child's best interest.

existed to support a finding under subsections Sections 161.001(b)(1)(D), (E), and (O), and that termination of Mother's parental rights to A.R. was in the best interests of the child.[2] These appeals followed.

## Best Interest of the Child

In her sole issue on appeal, Mother contends that the evidence is factually insufficient to support the trial court's findings that termination of her parental rights is in the best interests of K.J.B. and A.R.[3]

### A. Standard of Review

In a case to terminate parental rights under Texas Family Code Section 161.001, the Department must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and (2) termination is in the best interest of the child. TEX. FAM. CODE § 161.001(b). The Department must prove both elements—a statutorily prescribed predicate finding and that termination is in the child's best interest—by clear and convincing evidence. *See* TEX. FAM. CODE § 161.001(b); *see In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). The Family Code defines "clear and convincing

---

[2]     The court terminated A.R.'s father's parental rights under Family Code Section 161.002 and found that termination was in the child's best interest.

[3]     Mother does not challenge on appeal the trial court's findings that clear and convincing evidence existed to support the predicate grounds for termination of her parental rights to K.J.B. and A.R. under Section 161.001(b)(1)(D), (E), and (O).

evidence" as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

When assessing the factual sufficiency of the evidence in a termination proceeding, we consider the entire record, including disputed evidence. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). The evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have resolved in favor of the finding is so significant that the factfinder could not reasonably have formed a firm belief or conviction. *Id.* We give due deference to the factfinder's findings, and we cannot substitute our own judgment for that of the factfinder. *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *See id.* at 109.

## B. Applicable Law

Protection of the best interest of the child is the primary focus of the termination proceeding in the trial court and our appellate review. *See In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). A parent's right to "the companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). Accordingly, we strictly scrutinize

18

termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

There is a strong presumption that the best interest of a child is served by keeping the child with the child's natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE § 263.307(a).

Courts may consider the following non-exclusive factors in reviewing the sufficiency of the evidence to support the best interest finding:

(1) the desires of the child;

(2) the present and future physical and emotional needs of the child;

(3) the present and future emotional and physical danger to the child;

(4) the parental abilities of the persons seeking custody;

(5) the programs available to assist those persons seeking custody in promoting the best interest of the child;

(6) the plans for the child by the individuals or agency seeking custody;

(7) the stability of the home or proposed placement;

(8) the acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and

(9) any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive, and evidence is not required on all of them to support a finding that terminating a parent's rights is in the child's best interest. *Id.*; *In re D.R.A.*, 374 S.W.3d at 533.

In addition, the Texas Family Code sets out factors to be considered in evaluating the parent's willingness and ability to provide the child with a safe environment, including: the child's age and physical and mental vulnerabilities; whether there is a history of substance abuse by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, protection from repeated exposure to violence even though the violence may not be directed at the child, and an understanding of the child's needs and capabilities. TEX. FAM. CODE § 263.307(b); *In re R.R.*, 209 S.W.3d at 116.

## C.    Analysis

Mother argues that the evidence was factually insufficient to support the trial court's findings that termination of her parental rights was in K.J.B.'s and A.R.'s best interests. She argues that there was no evidence or testimony elicited showing that their current foster placement wished to adopt the children or that the children were adoptable.

### 1.    Placement Plans

While evidence of placement plans and adoption are certainly relevant to a best interest analysis, a lack of evidence about definitive plans for permanent placement and adoption cannot be the dispositive factor. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). Otherwise, best interest determinations would regularly be subject to reversal on the sole basis that an adoptive family cannot yet be located. *Id.* Instead, we ask whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent's rights is in the child's best interest—even if the agency is unable to identify with precision the child's future home environment. *See id.*

*Here, a*lthough the foster parent testified that she did not intend to adopt K.J.B. and A.R., she testified that the boys could remain in their foster placement with her for as long as necessary while the Department sought a permanent placement for them. Moser testified that the boys are currently in a loving foster

home where all their needs are being met and that the foster parents are preschool teachers and own a daycare. Moser testified that the Department had sent out a legal broadcast for A.R. and that it intended to send out a nationwide broadcast for both siblings so they could remain together. She testified that the Department had already received one home study although she did not know the status of that study. She had also recently learned that a teacher at K.J.B.'s school expressed interest in adopting both boys. This factor does not weigh against termination.

### 2. Children's Needs and Parental Abilities of Those Seeking Custody

In addition to the evidence showing that K.J.B.'s and A.R.'s foster placement was meeting all their needs—medical, emotional, psychological, and nutritional—the evidence showed that the boys were thriving in their current foster placement.

Moser testified that when K.J.B. came into the Department's care, he was being neglected educationally and was very behind in school. Moser stated that Mother was so overwhelmed trying to handle A.R. that she was unable to care for K.J.B. K.J.B.'s foster mother testified that since his placement with her, he is doing well in school and his grades are improving.

Regarding A.R., the evidence showed that he had "severe to profound intellectual disability and/or autism spectrum disorder with marked to profound deficits in adaptive functioning in one or more areas: communication, social participation and independent living across multiple environments." A.R.'s

cognitive functioning appeared "to be at or below the moderate intellectual range resulting in severe and profound deficits in comprehension, achievement, and adaptive functioning," and he was nonverbal. A.R. was removed and placed in the Department's care when he was five years old after police officers found him wandering along the feeder road of Highway 290, covered in hives, and dressed in a soiled diaper. A.R. is nonverbal and was unable to tell the officers who his mother was or where he lived. When the officers located Mother, she appeared to be under the influence of drugs or alcohol and later tested positive for methamphetamines.

Moser testified that when A.R. came into the Department's care, he was a "wild" child who ran the moment a door opened. When A.R. was placed in his first foster home, he was entirely nonverbal, flung things across the room, threw tantrums, hit himself and tried to strike adults, broke things, and ate with his hands. Moser testified that after A.R. was placed in his first foster home, his behavior drastically changed and that he was flourishing in the placement. A.R. was learning sign language as well as his colors, letters, and numbers. A.R. was receiving occupational therapy, speech therapy, and play therapy in his foster placement.

In addition to the evidence above, we may consider the parent's past performance as a parent in evaluating her present abilities to provide for the child. *See In re C.H.*, 89 S.W.3d at 28. Although evidence of past misconduct or neglect alone may not be sufficient to show present unfitness, a factfinder may measure a

23

parent's future conduct by her past conduct indicating that it is in a child's best interest to terminate her parental rights. *See In re A.N.D.*, No. 02-12-00394-CV, 2013 WL 362753, at *2 (Tex. App.—Fort Worth Jan. 31, 2013, no pet.) (mem. op.). Here, the record showed that another child, J.S.R., was removed after Mother tested positive for crack cocaine during her pregnancy. Her parental rights were terminated and J.S.R. was later adopted. *See In re N.E.*, No. 01-22-00739-CV, 2023 WL 2530197, at *9 (Tex. App.—Houston [1st Dist.] Mar. 16, 2023, pet. denied) (mem. op.) (concluding evidence showing that mother's parental rights were previously terminated to another child based on trial court's finding, among others, that Mother had engaged in conduct which endangered physical or emotional well-being of child was past conduct indicating termination was in child's best interest). These factors weigh in favor of termination. *See Holley*, 544 S.W.2d at 372; TEX. FAM. CODE § 263.307(b).

### 3. Present and Future Emotional and Physical Danger to Children and Stability of Home

A parent's past conduct is probative of her future conduct when evaluating the child's best interest. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.). A fact finder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent when assessing the best interest of the child. *In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.).

24

The evidence showed that Mother had an extensive history with the Department involving repeated reports of abuse and neglect because of her drug use. The Department received reports in 2009, 2011, and two reports in 2014, alleging Mother physically abused and neglected previous children, as well as K.J.B., because of her drug use. In 2009, Mother and one of her children tested positive for barbiturates and Mother tested positive for opiates, and Mother went to jail as a result. In 2011, Mother used cocaine while pregnant with another child which resulted in the child being removed and her parental rights being terminated. In 2014, Mother tested positive for cocaine while pregnant with K.J.B. One month later, the Department received a report that Mother was holding K.J.B. during a domestic violence incident involving her boyfriend. Mother later tested positive for drugs in May 2022 after she was admitted to a substance abuse treatment center. She also failed to show up for monthly drug testing from June through November 2022. Given her history of substance use, and her positive result in May 2022, the trial court could have concluded that the reason she regularly failed to appear for drug testing in the months leading up to trial was that she was continuing to use illegal drugs. *See In re J.H.G.*, No. 01-16-01006-CV, 2017 WL 2378141, at *6 (Tex. App.—Houston [1st Dist.] June 1, 2017, pet. denied) (mem. op.) (noting that parent's refusal to submit to drug testing may be treated as if parent would have been positive for illegal drugs). The evidence also showed that Mother was charged with "prostitution w/3rd or

25

more" in October 2022, and she did not have a stable home or employment as of November 2022, the month before trial.

The evidence of Mother's drug use, criminal activity, and instability are indicative of the present and future physical and emotional dangers posed to both children. *See In re Z.H.*, No. 14-19-00061-CV, 2019 WL 2632015, at *6 (Tex. App.—Houston [14th Dist.] June 27, 2019, no pet.) (mem. op.) (considering parent's drug use in the context of evaluating the present and future emotional and physical danger to the child); *In re N.J.H.*, 575 S.W.3d 822, 834–35 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (holding that parent's past pattern of drug use weighed in favor of finding that termination was in child's best interest under several *Holley* factors, and was relevant to his parenting abilities, stability of home he would provide, emotional and physical needs of his child, and emotional and physical danger in which child would be placed); *In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (noting factfinder can give "great weight" to "significant factor" of drug-related conduct); *In re O.N.H.*, 401 S.W.3d at 684 (stating parent's past conduct was probative of his future conduct when evaluating child's best interest); *see also In re D.M.*, 452 S.W.3d at 471 (stating court may infer that past endangering conduct may recur if child was returned for purposes of determining whether termination is in child's best interest).

These factors weigh in favor of termination. *See Holley*, 544 S.W.2d at 372; TEX. FAM. CODE § 263.307(b).

In view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination of Mother's parental rights is in the best interests of K.J.B. and A.R. *See In re J.O.A.*, 283 S.W.3d at 345. We overrule Mother's sole issue in K.J.B.'s and A.R.'s cases.

## Conclusion

We affirm the trial court's final decrees of termination in both cases.

Amparo Guerra
Justice

Panel consists of Chief Justice Adams and Justices Farris and Guerra.

27